MINNEAPOLIS FEDERATION OF TEACHERS, LOCAL 59,
AFL-CIO, v. PETER OBERMEYER AND OTHERS.
BOARD OF EDUCATION OF SPECIAL SCHOOL DISTRICT
NO. 1 v. MINNEAPOLIS FEDERATION OF TEACHERS,
LOCAL 59, AFL-CIO, AND ANOTHER.*

147 N. W. (2d) 358.

December 9, 1966—Nos. 40,477, 40,478.

*Certified to U. S. Supreme Court March 13, 1967.

348

*Joseph E. Hamilton, Howard, Peterson, LeFevere, Lefler & Hamilton, William E. Holcomb,* and *Sanborn, Jackson & Rice,* for appellant.

*Vennum, Newhall, Ackman & Goetz* and *Melvin I. Orenstein,* for respondent board of education.

*Samuel I. Sigal,* for respondent union.

*Peter S. Popovich, James E. Knutson,* and *Peterson & Popovich,* for Minnesota School Boards Association, amicus curiae.

*Roger A. Peterson* and *Helgesen, Peterson, Engberg & Spector,* for Minnesota Federation of Teachers, AFL-CIO, amicus curiae.

*Donald C. Savelkoul,* for Minnesota AFL-CIO Federation of Labor, amicus curiae.

MURPHY, JUSTICE.

These are appeals from judgments entered in declaratory judgment actions. Error is assigned in the trial court's holding that L. 1965, c. 839, § 7 (Minn. St. 179.572), which excepts teachers from the application of the rest of c. 839, is unconstitutional and severable. Chapter 839 amended and added new provisions to the so-called Public Employees Labor Relations Act (Minn. St. 179.50 to 179.58).

The parties involved in this appeal are rival groups of public school teachers. Respondent Minneapolis Federation of Teachers, Local 59, is a trade-union-oriented organization affiliated with the AFL-CIO and hereinafter referred to as "Local 59." Appellant, City of Minneapolis Education Association, a nonunion organization, is affiliated with the Minnesota Education Association and the National Education Association. These two organizations have deep and irreconcilable differences which give rise to a conflict between them as to the manner in which teachers should communicate and treat with school boards on subjects relating to wages and conditions of employment.[1] We gather from the extended arguments submitted, the original files which constitute the record, briefs of the parties, and briefs amicus curiae that both groups seek the same objective but differ as to means. A review of the attempts of public school teachers to attain some satisfactory basis for meaningful communication with school boards by which their demands might be made known, considered, and resolved in a manner consistent with individual dignity and the ethics of their calling is a study of frustration.

Some background references should be noted. The threat of a strike as a means of dealing with employer-employee relationships in the public educational system came to the surface in January 1951, when the Board of Education of the city of Minneapolis sought an injunction restraining a threatened strike by a union composed of school mainte-

---

[1] Procedural aspects of this litigation are discussed in a recent decision of this court. Minneapolis Federation of Teachers v. Obermeyer, 275 Minn. 46, 144 N. W. (2d) 789.

nance employees. Board of Education of City of Minneapolis v. Public School Employees' Union, 233 Minn. 144, 45 N. W. (2d) 797, 29 A. L. R. (2d) 424. The disposition of that dispute turned upon the interpretation of a procedural statute and contributed nothing to the law with which we are here concerned aside from raising a spectre of the dangers of strikes by public employees, a subject which the legislature promptly acted upon at its next session. By L. 1951, c. 146, the legislature adopted an act "to prohibit strikes by certain public employees; to provide certain disciplinary action with respect thereto; to provide for the adjustment of grievances and reporting the facts relative thereto; and to provide conditions of reemployment." This act was amended by L. 1957, c. 789, which provided that public employees "shall have the right to form and join labor organizations" and prohibited intimidation or coercion in such activity. Apparently, the act was also intended to aid public employees in their dealings with heads of government agencies. The act comprehended that the services of the labor conciliator should be utilized to investigate controversies and to ascertain representatives of employee groups by means of a secret ballot. By our decision in Richfield Federation of Teachers v. Richfield Education Assn. 263 Minn. 21, 27, 115 N. W. (2d) 682, 686, this provision of the act was found to be lacking in vitality. We there held that "the Conciliator has no implied authority to specify units of representation for purposes of implementing the provisions of the act governing meetings between public employers and public employees under § 179.52."

The next development occurred when President Kennedy promulgated an executive order on January 17, 1962, on "Employee-Management Cooperation in the Federal Service." Exec. Order No. 10988, 27 F. R. 551. This order provided definite means of communication between associations of Federal government employees and agency heads, which would make it possible to focus public attention upon the merits of employee claims. Apparently, the Minnesota Legislature intended that the 1965 Public Employees Labor Relations Act should be patterned after the proposals contained in President Kennedy's executive order. In amending prior laws on the subject, the legislature in L. 1965,

c. 839, recognized in its statement of policy that "adequate means should be provided for preventing controversies between governmental agencies and public employees, and for resolving them when they occur." Because the nature of governmental service required "special limitations upon public employment," it was incumbent upon the state to provide "orderly procedures for the participation by public employees and their representatives in the formulation of personnel policies and plans to insure the fair and considerate treatment of public employees, to eliminate employment inequities, and to provide effective means of resolving questions and controversies with respect to terms and conditions of employment." The legislature expressed the policy that governmental agencies should "enter into discussions with affirmative willingness to resolve grievances and differences" and that there was a "mutual obligation to endeavor in good faith to resolve grievances and differences * * * within the framework of laws and charter provisions." It is unnecessary to go into the various provisions of c. 839 except to say that in substance it provides for a collective bargaining arrangement for meaningful negotiations subject to the limitation that it does not insure binding arbitration—a limitation inherent in the nature of governmental employment. The act reaffirms denial of the right to strike; affirms the right of public employees to form and join labor or employee organizations; and provides for the election of a representative who may bargain and treat with agency heads as the representative of all employees if the organization represents a majority of the employees.

The part of c. 839 which gives rise to this controversy is § 7 (Minn. St. 179.572), which states that the act shall not apply to public school teachers as defined in Minn. St. 125.03, subd. 1. The reason for this exception was that the legislature intended to make special provision for the manner in which school teachers should treat with school boards with relation to questions growing out of their employment. Simultaneously with the enactment of c. 839, the legislature enacted a bill which provided teachers with grievance and representation machinery differing from that provided for other public employees. The bill, House File 1504, was entitled "A Bill for an Act Relating to the Teaching Profession and Providing for the Settlement of Disputes Be-

TWEEN SCHOOL BOARDS AND CERTIFIED SCHOOL PERSONNEL IN THE PUBLIC SCHOOLS OF THIS STATE." This bill expressed the policy that it would be in the best interests of public education "that a legal procedure be established on a professional level for the orderly, equitable and expeditious settlement of * * * disputes." The bill affirmed the right of teachers "to join and form organizations" to deal with the terms and conditions of professional public education and their right "not to join and form such organizations." It affirmed the right of certificated school personnel "to designate representatives for the purpose of meeting with the school board or any committee thereof in an effort to reach a solution to problems" arising from terms and conditions of employment. It recognized the right of representatives to meet and to confer "in good faith" with school boards or their committees and recognized that the parties should make every reasonable effort to resolve disputes. It imposed upon the school board the duty to provide an opportunity for hearing upon request and delegated to the boards the right to establish procedures "for carrying on meetings and for reaching agreement." The bill provided for a form of appeal to the commissioner of education under circumstances where a school board would refuse to meet and confer. In the event of failure to reach a settlement, the commissioner of education was to "act to resolve such disputes by appointing a mediator who shall be qualified, trained and experienced in the field of public education." The bill delegated to the commissioner the power to "prescribe rules regulating the time and manner" of taking such appeals. The bill provided that if conferences with the mediator were not satisfactory, at the request of a majority of the "certificated school personnel" an adjustment panel should be constituted to hear the dispute.

The bill passed both the house and the senate, but was vetoed by the governor. Both it and c. 839 were part of a package relating to an entire field, but, because of the governor's veto, only one became law. In his letter informing the secretary of state that he would not sign the bill, the governor said:

"Since good results were achieved by the non-partisan committee appointed by me to recommend improvements to the public employees

labor relations law, I see no reason that a similarly constituted committee could not work out answers to the problems with which we are faced. I will appoint such a committee and charge it with the responsibility of investigating these problems and making recommendations to the 1967 session of the Legislature."

With the legislation in this freak posture, where one of two concurrent bills relating to the entire field of public employees labor relations was vetoed and the other signed into law, Local 59 insisted upon proceeding to have elections held and a representative determined to negotiate in behalf of the school teachers pursuant to the provisions of c. 839. In the proceedings before the lower court, it was held that this could be done. The trial court held that § 7 was unconstitutional as an unreasonable and arbitrary classification of teachers separate and apart from other state employees and concluded therefore that in spite of the clear intent of the legislature, the governor's veto of the concurrent bill fortuitously brought the teachers within the compass of c. 839.

■ Since we hold that § 7 is a constitutional classification, it is unnecessary for us to discuss the issue of severability (Minn. St. 645.20) upon which the decision of the lower court rests. If there is anything clear from the standpoint of legislative intent and contemporary history of this legislation, it is that the teachers were not to be included in the provisions of c. 839 and that they were to be governed by other provisions. It may be said by way of dicta that even if it is assumed that § 7 is unconstitutional, we have been cited to no authority to the effect that the court may extend the application of the statute beyond the limits of its provisions. To construe a statute so as to extend its provisions to cover that which is specifically excluded by the legislature seems to us to be an exercise of lawmaking power which courts do not possess. 16 Am. Jur. (2d) Constitutional Law, § 192.

■ The principal issue presented is raised by the contention that § 7 is unconstitutional as denying to public school teachers employed by boards of education the statutory benefits granted to all other employees, including teachers employed by the state university and state colleges. We find no definite rule of universal application to determine whether

a particular classification is reasonable or unreasonable. It must be recognized that all legislation involves classification since the very idea of legislation implies distinctions and categories of one sort or another. The mere presence of inequality does not in itself determine the question of constitutionality. 16 Am. Jur. (2d) Constitutional Law, § 494; 3B Dunnell, Dig. (3 ed.) § 1669. The standards of the equal protection clause of the Fourteenth Amendment of the United States Constitution are the same as the standards of equality under art. 1, § 2, and art. 4, §§ 33 and 34, of the Minnesota Constitution. C. Thomas Stores Sales System, Inc. v. Spaeth, 209 Minn. 504, 297 N. W. 9.

When the legislature has determined that a sufficient distinction exists between two classes of persons to justify applying rules to one class which do not apply to the other, such determination is binding upon the courts unless it appears that the distinction is purely fanciful and arbitrary and that no substantial or logical basis exists therefor. Classification can never be a judicial question except for the purpose of determining, in a given situation, whether the legislative action is clearly unreasonable. In the matter of classification courts have viewed the action of the legislature with great liberality. Courts are not to weigh the merits of a classification in the judicial balance and to reject it merely because they might favor a different standard. These principles are supported in numerous Minnesota authorities, including Fairview Hospital Assn. v. Public Bldg. Serv. Union, 241 Minn. 523, 64 N. W. (2d) 16; State ex rel. Ging v. Board of Education, 213 Minn. 550, 7 N. W. (2d) 544; Mathison v. Minneapolis St. Ry. Co. 126 Minn. 286, 148 N. W. 71; Eldred v. Division of Employment and Security, 209 Minn. 58, 295 N. W. 412; State v. International Harvester Co. 241 Minn. 367, 63 N. W. (2d) 547, appeal dismissed, 348 U. S. 853, 75 S. Ct. 78, 99 L. ed. 672; Arens v. Village of Rogers, 240 Minn. 386, 61 N. W. (2d) 508, appeal dismissed, 347 U. S. 949, 74 S. Ct. 680, 98 L. ed. 1096; Dimke v. Finke, 209 Minn. 29, 295 N. W. 75; Anderson v. City of St. Paul, 226 Minn. 186, 32 N. W. (2d) 538; Fabio v. City of St. Paul, 267 Minn. 273, 126 N. W. (2d) 259; Kaljuste v. Hennepin County Sanatorium Comm. 240 Minn. 407, 61 N. W. (2d) 757; Williams v. Rolfe, 262 Minn. 284, 114 N. W. (2d) 671. It is unnecessary to discuss the numerous points of

comparison and differences suggested by the opposing parties in support of their contentions. Our authorities support the proposition that the provisions of the State and Federal Constitutions which apply to classification of subject matter prohibit only unreasonable or arbitrary classification. Police and fire department employees have been recognized in separate classifications for various purposes. Fabio v. City of St. Paul, *supra;* Kellerman v. City of St. Paul, 211 Minn. 351, 1 N. W. (2d) 378. This court has repeatedly recognized the right of the legislature to treat classes of employees separately and differently for purposes of legislation in granting privileges or imposing burdens on members of the same general class. Fabio v. City of St. Paul, *supra* (police retirement); Kellerman v. City of St. Paul, *supra* (occupational diseases of firemen); Burns v. City of St. Paul, 210 Minn. 217, 297 N. W. 638 (police retirement); Kaljuste v. Hennepin County Sanatorium Comm. *supra* (workmen's compensation for public hospital employees who contract tuberculosis in the course of their employment).

It is well recognized that the legislature may classify professions, occupations, and businesses according to natural and reasonable lines of distinction, and if such legislation affects alike all persons of the same class, it is not an invalid classification. Legislation with reference to the teaching profession has generally been sustained as a valid classification. 16A C. J. S., Constitutional Law, § 496. The Supreme Court of Illinois has held that a classification of public school teachers as a distinct class for appropriate legislation "cannot be successfully challenged." Gorham v. Teachers' Retirement System, 27 Ill. (2d) 593, 599, 190 N. E. (2d) 329, 332. The court said in Krebs v. Board of Trustees, 410 Ill. 435, 443, 102 N. E. (2d) 321, 325, 27 A. L. R. (2d) 1434, 1441:

"The State legislature is charged with the duty of providing the residents of this State a free and public educational system. Such a system requires qualified and competent teachers. The legislature requires these teachers to have certain qualifications. The legislature, by tax laws, provides the means by which these teachers are paid during their teaching careers and thereby, at least indirectly, fixes the amount of their compensation. Under these circumstances, for the legislature to determine

that the welfare of the public school system required that a system of retirement allowances be set up for them as a group does not seem unreasonable, and there seems ample justification to distinguish them as a class for that purpose."

In Minnesota, teachers have been treated as a separate group for the purpose of classification in numerous instances. Separate classification has occurred in the Teachers Tenure Act, Minn. St. 125.17. Public school teachers in school districts outside cities of the first class are covered by the Continuing Contract Law, § 125.12. Public school teachers in cities of the first class are included in local teacher retirement associations established pursuant to §§ 354.15 to 354.23. Public school teachers outside cities of the first class come under §§ 354.05 to 354.14 and 354.31 to 354.61 of the Teachers Retirement Association Law. It should be noted that while the Continuing Contract Law and the Teachers Tenure Act of the cities of the first class apply to public school teachers, they do not apply to the University of Minnesota or state college faculty members. Public school teachers are required to be certificated under the Certification Act, § 125.03. On the other hand, the legislature has chosen to group other employees apart from public school teachers by the Civil Service Act, c. 43, which applies to state employees; the Veterans Preference Act, §§ 197.45 and 197.46; and the Public Employees Retirement Act, c. 353. Accordingly, it seems to us that the most persuasive argument in support of the constitutionality of L. 1965, c. 839, § 7, is that the legislature has historically treated teachers as a distinct classification, and this unique historical recognition is sufficient to classify the teachers for the purpose of this legislation.

Finally, we are committed to the principle that unless a law is unconstitutional beyond a reasonable doubt, it must be sustained. The burden of proof in this respect is on the party seeking to set the law aside. In re Taxes on Property of Cold Spring Granite Co. 271 Minn. 460, 136 N. W. (2d) 782; Williams v. Rolfe, *supra*. Under all the circumstances, including the past and contemporary history of the legislation before us, we cannot say that the claim that § 7 is unconstitutional has been sustained.

■ This brings us to the present status of the law as it bears upon the statutory rights of teachers with relation to bargaining or negotiation of wages and working conditions. As we view c. 839, it repeals prior laws dealing with public employee labor relations as it affects teachers, except §§ 179.51 and 179.53 to 179.56, which include the "no strike" section and provisions imposing sanctions in the event of strikes. Counsel for respondent school board suggests in his brief that c. 839 should be construed so as to preserve for teachers the provisions of Minn. St. 1961, § 179.52, which provided for an election to select representatives to meet with the school board. We fail to discern what purpose would be served by the innocuous provisions of that section which could not be attained by discussions or conferences conducted in good faith between the school board and representatives of the two teacher organizations. In any event, we are confronted here with a situation where c. 839 covered some of the same subject matter as that dealt with in the previous act. It revised the former method of procedure and provided a different manner of conducting negotiations with heads of state agencies. It is well established that "[w]hen a law purports to be a revision of all laws upon a particular subject, or sets up a general or exclusive system covering the entire subject matter of a former law and is intended as a substitute for such former law, such law shall be construed to repeal all former laws upon the same subject." State v. Elam, 250 Minn. 274, 281, 84 N. W. (2d) 227, 232; 17 Dunnell, Dig. (3 ed.) § 8928.

As we view the provisions of c. 839, it covers the whole subject matter of those earlier provisions of the Public Employees Labor Relations Act which it amended; plainly shows that it was intended as a substitute for them; and consequently operates as a repeal of them. State v. Roselawn Cemetery Assn. 259 Minn. 479, 108 N. W. (2d) 305.

■ It is also argued that c. 839 should be construed so that with respect to teachers the provisions of the Public Employees Labor Relations Act amended by c. 839 remain in effect. It is asserted that if the provisions of the former act are construed as having been repealed, public school teachers will be left with the denial of the right to strike without

the benefit of the right to join labor or other organizations.[2] On this point it should be observed that provisions relating to the denial of the right to strike and the affirmation of the right to join labor organizations neither added to nor detracted from existing rights of state employees. Even in the absence of a statute, we know of no authority which gives a public employee the right to strike. In Norwalk Teachers' Assn. v. Board of Education, 138 Conn. 269, 274, 83 A. (2d) 482, 484, 31 A. L. R. (2d) 1133, 1138, President Franklin D. Roosevelt, who was certainly no enemy of labor unions, is quoted as saying:

"* * * [A] strike of public employees manifests nothing less than an intent on their part to prevent or obstruct the operations of Government until their demands are satisfied. Such action, looking toward the paralysis of Government by those who have sworn to support it, is unthinkable and intolerable."

Nor did repeal of the statute affirming the right to join labor unions or other associations operate to their prejudice. The law in its present posture does not prohibit membership in a labor union. The right of freedom to assemble granted under the First Amendment permits teachers to join unions or associations organized to promote their mutual interest. Obviously, membership in a union which is committed to the use of a strike as a weapon in negotiations with the school board violates the spirit of the law and according to some authorities would justify prohibitory sanctions. Annotation, 31 A. L. R. (2d) 1142, 1159 to 1164. In the absence of a prohibitory statute or regulation, no good reason appears why school teachers should not organize as a labor union. Norwalk Teachers' Assn. v. Board of Education, supra; 1961 Wis. L. Rev. 609.

We gather from the briefs that there is no serious controversy on these

---

[2] Authorities dealing with this area of the law are collected and discussed in numerous articles, including Note, 45 Minn. L. Rev. 249; Anderson, *Labor Relations in the Public Service,* 1961 Wis. L. Rev. 601; Note, 55 Col. L. Rev. 343; Note, 75 Harv. L. Rev. 391; and Seitz, *Legal Aspects of Public School Teachers Negotiating and Participating in Concerted Activities,* 49 Marquette L. Rev. 487.

points. The teachers' problem arises from the denial of proper means for communication. The right to join a union or other organization is of little benefit if there are no means by which teachers can communicate with school boards through representatives of such organizations.

■ The next point raised is whether the school board has implied power to conduct an election and bargain with elected representatives of teacher organizations. The school board possesses only such powers as are granted by statute. Board of Education v. Sand, 227 Minn. 202, 34 N. W. (2d) 689. There is no authority, either express or implied, by which the school board can hold an election for the purpose of designating an exclusive representative of the teachers. This subject is dealt with in an extensive annotation contained in 31 A. L. R. (2d) 1142. The decisions generally hold that the manner in which public authorities must determine the wages, hours, and working conditions of public employees is governed entirely by the Constitution, statutes, municipal charters, civil service rules and regulations, and resolutions setting out the authority of the public employer. Public employees do not have collective bargaining rights in the same sense that private or industrial employees enjoy them. There must be some statutory provision authorizing collective bargaining. The reason is that the public employer cannot abdicate or bargain away continuing legislative discretion and is not authorized to enter into collective bargaining agreements without specific authority. The fact that statutory provisions grant the right of collective bargaining to employees in private industry does not confer such right on public employers and employees. Richfield Federation of Teachers v. Richfield Education Assn. *supra;* Annotation, 31 A. L. R. (2d) 1170.

There is nothing to prevent the heads of governmental agencies from meeting with, or discussing wages, hours, and conditions of employment with, groups or individuals representing groups of the employee class. The question of collective bargaining for public employees generally, and school teachers particularly, was considered in Norwalk Teachers' Assn. v. Board of Education, *supra.* The Norwalk teachers' association had a membership consisting of all but two of the teachers in the school system. In the absence of express statutory procedures, the association and the board had in fact entered into an agreement. In this context

the court laid down its rules as to recognition and collective bargaining in this statement (138 Conn. 277, 83 A. [2d] 486, 31 A. L. R. [2d] 1140):

"* * * There is no objection to the organization of the plaintiff as a labor union, but if its organization is for the purpose of 'demanding' recognition and collective bargaining the demands must be kept within legal bounds. What we have said does not mean that the plaintiff has the right to organize for all of the purposes for which employees in private enterprise may unite, * * *. Nor does it mean that, having organized, it is necessarily protected against unfair labor practices * * * or that it shall be the exclusive bargaining agent for all employees of the unit, * * *. It means nothing more than that the plaintiff may organize and bargain collectively for the pay and working conditions which it may be in the power of the board of education to grant."

The court there held that it was permissible to have a teachers' organization recognized as a representative as long as it was not the exclusive representative for teachers.

It would appear that even without express statutory authority, there is nothing to prevent collective bargaining when it is entered into voluntarily and no prohibitory state statute exists. Even though courts may sanction voluntary bargaining in the absence of statute, satisfactory results can hardly be expected.[3] A statute is needed to spell out procedures to be used in the determination of majority representatives in an appropriate unit. But this is a legislative concern. It may be assumed from the statement expressed in the governor's veto message that H. F. 1504, or some law similar to it, will at the next legislative session provide teachers with rights correlative to those given to other employees of the state. In the meantime, there is nothing to prevent the school board from meeting with representatives of both teacher groups. Certainly, in the past the school board has not dealt individually with its more than 3,000 teachers. Until the legislature provides a better method, the parties must resort to the former methods employed to solve their differences.

Reversed.

---

[3] Seitz, *supra,* p. 498.

THOMAS GALLAGHER, JUSTICE (dissenting).

1. The right to strike is not involved in this case. Respondent Minneapolis Federation of Teachers, Local 59, AFL-CIO, in a separate action brought in the district court was enjoined from engaging in any strike. The federation did not appeal from this injunction and no issue is now presented involving the constitutionality of Minn. St. 179.51, prohibiting strikes; or of §§ 179.54 and 179.55, imposing forfeitures and penalties upon public employees who strike.

It is undisputed that some 1,613 employees of Minneapolis Special School District No. 1, including clerks, stenographers, nurses, building tradesmen, part-time teacher aides, janitor-engineers, and others, are covered by the 1965 Public Employees Labor Relations Act, L. 1965, c. 839. In addition, it is not disputed that some 6,500 faculty members of the University of Minnesota and several thousand faculty members of the five state colleges and all classified employees of the state's public school boards are included within the act. But by virtue of c. 839, § 7 (Minn. St. 179.572), all public elementary and high school teachers are excluded from its terms.

2. In my judgment this exclusion constitutes a discrimination against such public elementary and high school teachers and is therefore unconstitutional. The majority seeks to uphold the validity of the exclusion upon the theory that "[a] statute should not be construed so as to extend its provisions to cover that which is specifically excluded by the legislature." While this principle is well established, it can have no application where the constitutionality of the specific exclusion is in issue. Certainly if the exclusion is of itself unconstitutional, it cannot be upheld upon the theory that the language creating it is clear and definite.

The Minnesota Public Employees Labor Relations Act, L. 1965, c. 839, provides a mechanism whereby all public employees, except elementary and high school teachers, may participate in the formulation of personnel policies governing their employment. The purposes of the act and the public policy are defined in § 1 (Minn. St. 179.50) as follows:

"Unresolved disputes in the public service are injurious to the public, the governmental agencies, and public employees; therefore, adequate

means should be provided for preventing controversies between governmental agencies and public employees and for resolving them when they occur. Because the paramount interest of the public and the nature of governmental processes make it necessary to impose special limitations upon public employment, it is incumbent upon governmental agencies to provide orderly procedures for the participation by public employees and their representatives in the formulation of personnel policies and plans to insure the fair and considerate treatment of public employees, to eliminate employment inequities, and to provide effective means of resolving questions and controversies with respect to terms and conditions of employment. It is the public policy of the state of Minnesota that governmental agencies, public employees and their representatives shall enter into discussions with affirmative willingness to resolve grievances and differences. Governmental agencies and public employees and their representatives shall have a mutual obligation to endeavor in good faith to resolve grievances and differences relating to terms and conditions of employment, acting within the framework of laws and charter provisions, and giving consideration to personnel policies, position classification and compensation plans, and other special rules governing public employment."

Under these clearly expressed purposes and public policies I find no justification for differentiating between the benefited public employees and the excluded public school teachers. Many of the former are lawyers, doctors, professors, assistant professors, instructors, and administrators employed by the university and by the state colleges. They are professionals who may or may not have an interest in utilizing the protection and rights afforded by the act, but if they desire its protection, they may seek it. What valid reason is there for excluding public school teachers from these same benefits? Certainly they are in the same professional class as are teachers and instructors employed by the university or other state educational institutions.

To justify the exclusion of any particular group of citizens from the benefits of a legislative enactment, it must be shown that there is a substantial difference or distinction between the group excluded and the

groups covered by the enactment. As stated in State ex rel. Bd. of Courthouse & City Hall Commrs. v. Cooley, 56 Minn. 540, 550, 58 N. W. 150, 153:

*"The fundamental rule is that all classification must be based upon substantial distinctions, which make one class really different from another. * * * [I]t must be based upon some natural reason,—some reason suggested by necessity,* by some difference in the situation and circumstances of the subjects placed in the different classes, suggesting the necessity of different legislation with respect to them. By necessity is meant practical, and not absolute, necessity; but *the characteristics which will serve as a basis of classification must be substantial, and not slight or illusory.*" (Italics supplied.)

3. Chapter 839 created a new public policy which made sweeping changes in the laws relative to public employees by establishing for the first time certain rights and privileges for them. Obviously, the enactment was based upon the legislature's carefully considered conclusion that public employees, including public school teachers, like their counterparts in private enterprise are subject to the same vicissitudes of rising prices, accident, illness, and old age. Everywhere people are seeking to assert a measure of control over the conditions under which they work and live. By its enactment of c. 839, the legislature recognized this and the right of some 160,000 public employees of the state to be represented by labor organizations of their choice in matters pertaining to their employment contracts. The exclusion of public school teachers from the benefits of this enactment, while at the same time leaving them subject to the forfeitures and penalties provided for in other statutory enactments now in effect, in my judgment constitutes a discriminatory treatment of this group which is entirely without a valid basis.

4. The majority seeks to justify this special classification for public school teachers on the ground that the "legislature has historically treated teachers as a different classification," citing Minn. St. 125.17; 125.12; 354.05 to 354.14; 354.31 to 354.61; 125.03; the Civil Service Act, c. 43; the Veterans Preference Act, §§ 197.45 and 197.46; and the Public Employees Retirement Act, c. 353, as statutes illustrative of this. While

these statutes demonstrate that teachers, like most classifications of public employees, have working conditions distinct to them with respect to tenure, continuing contract rights, retirement benefits, and the like, if the validity of statutory classifications under a public employees labor relations act is to be tested by such factors, then the same distinctions as applied to hundreds of other classifications of public employees, each with distinctive working conditions, would justify the exclusion of any one of such classifications from the benefits of the act, and the possible loss of the benefits to be derived from a general enactment covering *all* public employees.

5. It also seems clear to me that the exclusionary provision embodied in § 7 of the act constitutes a violation of the Fourteenth Amendment of the Federal Constitution, which provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." Under this amendment, it is well settled that all residents of a state have the right to equal treatment and that a state must act without discrimination as to any of them. While a state is not under a duty to provide specific benefits, privileges, or services for its people, if it chooses to do so it must do so on an equal basis for all of them. Missouri ex rel. Gaines v. Canada, 305 U. S. 337, 59 S. Ct. 232, 83 L. ed. 208; McCabe v. Atchison, T. & S. F. Ry. Co. 235 U. S. 151, 161, 35 S. Ct. 69, 71, 59 L. ed. 169, 174. As stated in Quaker City Cab Co. v. Pennsylvania, 277 U. S. 389, 400, 48 S. Ct. 553, 554, 72 L. ed. 927, 929:

"* * * The equal protection clause does not detract from the right of the State justly to exert its * * * power or prevent it from adjusting its legislation to differences in situation or forbid classification in that connection, *'but it does require that the classification be not arbitrary but based on a real and substantial difference having a reasonable relation to the subject of the particular legislation.'* " (Italics supplied.)

Here I can find no real and substantial difference between public elementary and high school teachers, and many of the other classifications of public employees now covered by c. 839.

6. Collective bargaining between public employees and local, state, or Federal government agencies is no longer a novelty. Under presi-

dential executive order,[1] 531 exclusive recognitions covering over 700,000 Federal workers were given by Federal agencies to various unions representing Federal employees by November 1965 and it was recognized that such workers were authorized to bargain collectively through unions of their choice. Weisenfeld, *Public Employees—First or Second Class Citizens,* 16 Labor L. J. 685, 691. The American Federation of Teachers, AFL-CIO, with which the respondent local is affiliated, has conducted collective bargaining elections in school systems in Philadelphia, New York, Detroit, and Cleveland, as well as in numerous smaller cities and communities. The Minnesota Legislature by its enactment of c. 839 has recognized this trend and adopted it as a part of the public policy of the state. No reason whatever exists for excluding public school teachers from this public policy, or for granting other public employees of a similar professional character rights and privileges denied to public school teachers.

In my judgment § 7 of c. 839 is unconstitutional. Such a determination, of course, would not invalidate the remaining provisions of the act. State ex rel. Foster v. Naftalin, 246 Minn. 181, 74 N. W. (2d) 249; Hunter v. Zenith Dredge Co. 220 Minn. 318, 19 N. W. (2d) 795.

---

[1] Exec. Order No. 10988, 27 F. R. 551.